**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JANE DOE,<br><br>PLAINTIFF,<br><br>V.<br><br>JANNEY MONTGOMERY SCOTT, CRAIG MOSS, IN HIS PERSONAL AND PROFESSIONAL CAPACITIES, SCOTT GREENSPON, IN HIS PERSONAL AND PROFESSIONAL CAPACITIES, AND ALAN BOGATCH, IN HIS PERSONAL AND PROFESSIONAL CAPACITIES,<br><br>DEFENDANTS. | **COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Jane Doe, represented by Seppinni Law, alleges based on information and belief at all relevant times:

## INTRODUCTION

1. Born in Serbia, Plaintiff Jane Doe grew up in the shadow of fear and deprivation, amidst the wars following Yugoslavia's dissolution in the 1990s. Against the odds, she emigrated to the United States, started a family, excelled in graduate courses, and entered the finance industry.

2. By 2025, she was working as VP Risk Officer at Morgan Stanley. That year, one of the portfolio managers she oversaw, Defendant Craig Moss, recruited her to join him in moving to the advisory Janney, Montgomery, Scott (Janney), where he promised to make her the successor to his book of business.

3. The move would be as great a step into the unknown for Ms. Doe as emigrating. It would mean stepping from the secure brand and salary offered by Morgan Stanley to a new role as a financial advisor, where she would need to build her business from scratch.

4. Moss understood Ms. Doe's dependence on his power. Almost the moment they began together at Janney, he leveraged that power to pressure Ms. Doe for sex. Here are some of the vile things he said along the way:

- He joked that someone might rape her under anesthesia.
- He told her he could help her conceive a daughter, because he had conceived one before.
- He bragged about how his daughter was a Gibson Dunn attorney who told him he was a "poster child" for sexual harassment.
- He told male colleagues—in front of Ms. Doe—how beautiful Serbian women are and that he wants to have sex with them.
- He called Serbians "cockroaches" and mocked Ms. Doe's Greek Orthodox faith.
- He called her sons "fucking idiots" and denigrated her husband.

5. This is but a tiny sample of the hell to which Moss subjected Ms. Doe. He kept up his harassment of Ms. Doe for months. Every time she told him to stop, he reminded her of how much she depended on him, by dangling the promised succession. Finally, when it became clear she would persist in complaining about sexual harassment, he removed her from his team and cut her out of the succession to his book of business. These moves effectively ruined her career.

6. Janney office manager Scott Greenspon was aware of Moss's behavior and witnessed much of it. If Moss is the poster child of sexual harassment, Greenspon's acquiescence has made Janney corporation the poster child for corporate complicity.

7. With this complaint, Ms. Doe aims to change the way Janney does business, and protect female advisors and Janney employees in the future.

## JURISDICTION AND VENUE

8. The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff's claims arise under federal law.

9. The Court has supplemental jurisdiction over Plaintiff's state and local law claims under 28 U.S.C. § 1367(a). Plaintiff's state and local law claims derive from the same common nucleus of operative fact as the federal claims and form part of the same case or controversy.

10. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## ADMINISTRATIVE PROCEDURES

11. Plaintiff will file a charge of discrimination under Title VII with the EEOC and will seek leave to amend her complaint at the earliest possible juncture.

12. To comply with New York City Administrative Code § 8-502(c), Plaintiff will serve a copy of this Complaint on the New York City Commission on Human Rights and the Corporation Counsel of the City of New York within 10 days of filing this action.

## THE PARTIES

13. Plaintiff Jane Doe is a citizen of New York. Since October 31, 2025, Plaintiff has been a current employee of Defendants. At all relevant times, Plaintiff was an "employee" within the meaning of all relevant statutes.

14. Defendant Janney Montgomery Scott LLC is a limited liability company organized under the laws of Delaware, with its principal place of business at 1717 Arch Street, Philadelphia, PA 19103. At all relevant times, Janney was Plaintiff's "employer" within the meaning of all relevant statutes. Janney directed, controlled, and compensated Plaintiff's work.

15. Defendant Craig Moss is a citizen of New York. During the relevant period, Moss was a Financial Advisor, Executive Vice President/Wealth Management of Janney. Moss is an "employer" subject to individual liability under the New York State and City Human Rights laws.

16. Defendant Scott Greenspon is a citizen of New York. During the relevant period, Greenspon was a Financial Advisor, Senior Vice President of Janney. Greenspon is an "employer" subject to individual liability under the New York State and City Human Rights Laws.

17. Defendant Alan Bogatch is a citizen of New York. During the relevant period, Bogatch was a Financial Advisor, Executive Vice President/Wealth Management of Janney. Bogatch is an "employer" subject to individual liability under the New York State and City Human Rights Laws.

## THE FACTS

### 1. Jane Doe escapes war-torn Serbia, starts a family in the United States, and, after her long journey, becomes a VP at Morgan Stanley.

18. Jane Doe lived in Serbia through the fall of Yugoslavia and the ensuing decades of war and conflict. She survived bombings and violence and dreamed of building a better life.

19. She pursued an education in Belgrade and then London, eventually moving to the United States, where she earned a B.A. at Adelphi University (2019), graduating Magna Cum Laude with a 3.9 GPA, and an M.B.A. from Molloy University (2023), with a 4.0 GPA.

20. While she earned her degrees, Ms. Doe raised a family and became its primary bread-winner.

21. From 2018 to 2023, she worked as a Registered Wealth Management Associate at Merrill Lynch, among the United States' most prestigious and well-known wealth managers. There, she learned the wealth management industry, providing sales support to multiple financial advisors; onboarding and helping manage sensitive relationships with high net-worth individuals; tracking portfolio performance; and helping advisors increase their digital engagement.

22. In 2023, Ms. Doe won a career-defining post at Morgan Stanley as a Vice President (VP), Complex Risk.

23. In this job, she analyzed Morgan Stanley portfolios for legal compliance and risk, and coordinated legal and compliance responses to litigation and customer complaints.

24. While she rose in her career and raised a family, Ms. Doe found time to obtain FINRA and regulatory credentials, including the Securities Industry Essentials (SIE) exam, Series 7 (General Securities Representative), Series 66 (Combined State Law), Series 9 (General Securities Sales Supervisor - Options), and Series 10 (General Securities Sales Supervisor - General). She also earned a Life, Accident, and Health Insurance License, became a Chartered Retirement Planning Counselor and

Sports & Entertainment Accredited Management Advisor, was selected to participate in public corporate programs, and was a featured TEDx Speaker.

25. During her time at Morgan Stanley, Ms. Doe was responsible for overseeing risk for the portfolio of financial advisor Craig Moss.

26. Her relationship with Moss during at Morgan Stanley was collaborative and free of abuse.

### 2. Moss holds out the promise that Ms. Doe will succeed him and take over his book of business at Janney.

27. In 2025, Moss told Ms. Doe that he planned on leaving Morgan Stanley for financial manager Janney Montgomery Scott.

28. While Janney had less of a brand name, it would give him the opportunity to earn more and build his own team.

29. Impressed by Ms. Doe's all-arounder ability to advise across financial, compliance, and legal risks and her record of supporting client marketing and onboarding efforts, Moss identified her as a perfect recruit for a start-up advisement practice.

30. He began courting her to join him as a financial advisor at Janney.

31. Moss had to heavily incentivize Ms. Doe to leave Morgan Stanley. She had only recently shifted to a Risk role and become a VP.

32. To leave her VP role with an established brand and return to financial advising at a lesser-known company was an enormous risk, not just for her but for her family, which depended on her income and Morgan Stanley's strong healthcare plan. It would also require her to forego her year-end bonus at Morgan Stanley, give up 40% of her 401(k), and abandon a secure career path in the corporate officer ranks.

33. To make up for losing the material benefits of Morgan Stanley employment, Moss promised a generous salary and $250,000 loan, to be paid in installments by Janney so long as Ms. Doe remained in good standing.

34. He also promised that any new clients brought in by the team, which also included advisor Alan Bogatch, would have their associated income divided evenly three-ways among the three team members.

35. Under her final offer of employment, Moss had discretion to give Ms. Doe the share of new-client revenue he had promised.

36. Moss also offered to make Ms. Doe his successor after his eventual retirement. This arrangement served Moss's ends as well, since he is 67 years old and Bogatch is 74.

37. Bringing a younger advisor helped reassure Janney that their investment would be worthwhile in the long term.

38. Crucially, in support of the succession plan, Moss promised to personally train and mentor Ms. Doe, introduce her to clients, and begin handing those clients over to her, with their associated revenues.

39. This was the only promise that could truly compensate Ms. Doe for giving up her career at Morgan Stanley.

40. Only with these assurances of mentoring and partnership did Ms. Doe assent to leave her job at Morgan Stanley.

41. In July 2025, Moss, Bogatch, and Ms. Doe traveled together to Janney's corporate headquarters to interview with Janney's executive management team. During these formal onboarding meetings, Moss introduced Ms. Doe to Janney's senior leadership and attorneys as his designated successor.

42. One incident during these meetings foreshadowed what was to come. At a meeting with a Janney attorney, the attorney mentioned an incident at Morgan Stanley where Moss had grabbed a male employee's nipples. (It appears likely the attorney learned this through a call with a reference or through speaking to someone in his network at Morgan Stanley.) Moss, who is gregarious, was able to down-play it as an innocent prank.

### 3. With Ms. Doe locked into her new job, Moss begins harassing her, and expresses excitement at the prospect that someone might rape her.

43. Ms. Doe began her role at Janney on October 31, 2025.

44. She worked from Janney's Hauppauge office.

45. She immediately took on a huge amount of work, coordinating the complicated transfer of Moss and Bogatch's books of business from Morgan Stanley to Janney, working 7 a.m. to 10 p.m. weekdays and over weekends.

46. Overnight, Moss went from Ms. Doe's respectful and professional peer to her nemesis and boorish harasser.

47. It is clear, in retrospect, that he had always been sexually attracted to her and that his attraction motivated him to bring her to Janney. He had put her in a position where she was dependent on him professionally and economically. He took full advantage of that power to harass her and interfere with her ability to do her job.

48. Unlike some harassers, Moss did not slowly turn up the temperature. He simply began tearing into Ms. Doe, with a timing that appeared premeditated and with an impunity born of confidence that his employer would be on his side, as an advisor with a large and profitable book of business.

49. In November 2025, Ms. Doe was scheduled for an eye surgery that would require her to go under an anesthetic.

50. A few days before the surgery, November 13, Moss joked to Ms. Doe about how vulnerable her body would be while she was unconscious on the surgery table, suggesting someone could rape or sexually assault her while she was under the anesthesia. He seemed to relish this fantasy. Ms. Doe found the comments sickening.

51. In another early conversation, Moss told her that Hauppauge office branch manager Scott Greenspon had asked him whether he was sleeping with Ms. Doe, and whether that was the reason he brought her over from Morgan Stanley to Janney.

52. Moss also quickly established that he would not only make himself unavailable as a mentor, he would actively sabotage Ms. Doe's career progress.

53. As the two began transitioning clients over from Morgan Stanley, Ms. Doe held an in-office meeting with their client, M.L.[1]

54. While M.L. was seated across from Ms. Doe, Moss entered Ms. Doe's office, came up behind M.L., and began massaging her shoulders. M.L. became visibly upset and told him, "You can't touch me! You can't put your hands on me!"

55. This was not just shocking and unprofessional, it showed how difficult Moss would make it for Ms. Doe to retain clients, especially women.

56. On December 19, Moss and Ms. Doe were having a conversation where Ms. Doe referenced ideas being figuratively "shoved down her throat."

57. In front of two other team members, Alex Szczepanski and Cintra Bedassie, Moss asked Ms. Doe whether she liked to "shove balls down [her] throat."

58. While Moss chuckled to himself, his listeners fell silent; Ms. Doe was horrified.

59. Later that day, Ms. Doe told Moss that he could never say anything like that to her again.

[1] The names of non-party clients and prospective clients of Ms. Doe and Janney have been anonymized.

60. In response, Moss poured out reassurances that he was giving Ms. Doe his full book of business and supporting her, expressing perfectly his own understanding of his power over her.

61. In 2026, the bottom fell out; Moss's behavior became possessive and abusive in a way that suggested sexual jealousy.

62. If Ms. Doe did not answer his phone calls immediately, he would call repeatedly—sometimes 10 to 15 times in a row—until she answered.

63. Moss also would frequently belittle her experience and knowledge, which made no sense after his promises to mentor her.

64. At meetings, he spoke over her, ignored her, and tried to make her look foolish in front of their colleagues.

65. Other employees took their cues from Moss.

66. Shortly after Ms. Doe joined in the late 2025-early 2026 period, Associate Cintra Bedassie told Ms. Doe in a business meeting that she did not like working with female financial advisors because, in her experience, they were "bitches."

67. Bedassie repeated that every female financial advisor she had worked for had been a "bitch."

68. While the comment was distressing to Ms. Doe as the only female advisor in the office, she had to tread carefully because she depended on Bedassie to support her marketing and client servicing efforts.

69. Ms. Doe explained to Bedassie that she could not help taking the comment personally and that she found it inappropriate.

70. Shortly after Bedassie talked about female advisors being "bitches," Ms. Doe saw Bedassie disparaging her to another employee.

71. Ms. Doe began using a back door to the office to avoid passing Bedassie's desk.

### 4. Moss continues harassing Ms. Doe—asking her for a massage, telling her she is a bitch, announcing to prospective clients that he is "a poster child for sexual harassment," calling her crazy, and saying Serbian women are just about sex.

72. During a catch-up meeting about new business, Ms. Doe at one point mentioned that potential clients had to be "massaged" before they would come to the office to meet in person.

73. Moss responded by asking "when are you going to come massage me," and laughing.

74. In early February, Ms. Doe mentioned that her husband was going into surgery and she hoped he would be strong.

75. Moss responded by calling Ms. Doe "a tough bitch." But he quickly qualified—seeming to realize he should not have said it—that he meant it as a compliment.

76. After the surgery, Ms. Doe mentioned that her husband needed a lot of help, including with showering.

77. Moss responded, "when will you shower me?"

78. From this time on, Moss also constantly disparaged Ms. Doe's husband as a "loser."

79. In a different conversation that day, Moss referred to Ms. Doe's son as "fucking crazy."

80. After both conversations, Ms. Doe told Moss unequivocally not to use that kind of language.

81. Nonetheless, on another occasion he referred to her sons as "idiots."

82. On February 9, Moss's harassment once again directly interfered with Ms. Doe's ability to perform her job. That day, Ms. Doe brought to the office as prospective clients a married couple, G.M. and C.M.

83. G.M. and C.M. were Ms. Doe's personal friends. As Moss chatted with G.M. and C.M., he began talking about his family. He told G.M. and C.M. that his daughter is a sexual harassment attorney and that she tells him he is a "poster child" or "prime example" of "sexual harassment."

84. While Ms. Doe was able—barely—to salvage the situation with G.M. and C.M., at least two prospects brought in by Ms. Doe—M.C., an influential businesswoman, and the P. Family—declined to bring their business to Janney because of comments made by Moss.

85. During their meeting with the P. Family, Moss began discussing Lululemon stock but then shifted to talking about how the company's pants were transparent, which he said he liked because it allowed him "to see everything."

86. During their meeting with M.C., Moss repeatedly commented on her appearance, telling her how beautiful she was and saying he could not believe she was 67 years old.

87. He also repeated his comment that his daughter, who is a sexual harassment attorney, says he is a "prime example" and "poster child" for sexual harassment.

88. Craig later admitted to Greenspon that he made the "poster child" comments to G.M. and C.M. and to M.C. But he viewed the "poster child" joke as very funny, and Ms. Doe heard him make it to multiple clients.

89. On other occasions, Moss advertised that his daughter, a Gibson Dunn attorney, was a "shark" in defending harassment cases, which Ms. Doe took as a not-so-subtle discouragement to ever opposing Moss's sexual harassment.

90. Further discouraging Ms. Doe from complaining, Moss frequently boasted about his gun ownership and even carried a gun in his car to a client meeting with Ms. Doe.

91. At best, Moss failed to take Ms. Doe seriously or acknowledge her efforts to improve her position at Janney.

92. For instance, a few days after their disastrous meeting with G.M. and C.M., Ms. Doe purchased a ring light to help her produce marketing videos for social media.

93. Moss called her "crazy" and a "psychopath," ignoring how normal such equipment is and choosing to see Ms. Doe as vain and image obsessed.

94. Of course, the only one obsessed with Ms. Doe's image was Moss.

95. On February 24, 2026, Ms. Doe brought a Serbian couple to the office as prospective clients.

96. Ms. Doe did almost all the convincing and paperwork required to reel them in.

97. Moss's participation in the process was minimal, even though he was claiming one third of the income on the account.

98. After the couple left, Ms. Doe walked into Moss's office. He was on the phone with Bogatch, yelling "Alan, Serbian girls are so beautiful. We have to move there! We have to go to Serbia."

99. He added, "She looks just like [Jane Doe]. I wish I knew sooner about Serbian women!" Ms. Doe felt compelled to explain that Serbian women are culturally wholesome and care about hard work and family.

100. Moss shot back boisterously, "I don't care about that, it's about sex."

101. Ms. Doe could hear Bogatch laughing on the line.

102. Ms. Doe was horrified.

103. Meanwhile, Bedassie's hostility towards Ms. Doe had worsened.

104. Though Bedassie adequately and promptly supported Moss and Bogatch in whatever they needed, she boycotted assignments from Ms. Doe.

105. This was a huge problem, as Ms. Doe relied on Bedassie to send follow-up correspondence and paperwork to client prospects. Follow-ups like these need to be finished promptly to ensure the lead does not go cold.

106. In the spring, Ms. Doe lost several clients because Bedassie refused to send follow-up paperwork via FedEx. Feeling impunity, Bedassie even told her supervisor, Greenspon, that she was refusing to do this work for Ms. Doe.

107. When Ms. Doe confronted her about the FedEx labels, Bedassie told her that a FedEx overnight label was too expensive.

108. The response was outrageous and insulting—whether to spend anything (let alone such a small amount) was Ms. Doe's call to make, not Bedassie's.

109. It is inconceivable that Bedassie ever subverted orders from Bogatch or Moss, or sabotaged their marketing efforts in this way.

### 5. Ms. Doe realizes that Moss's promises of career progress were all fake, after Moss reveals that he views Ms. Doe as "honey for bees"; Bogatch tells her they are excluding her from the succession plans; she learns that Moss and Bogatch are taking her share of the split revenue.

110. While he harassed her, Moss also slowly withdrew from any pretense of training or mentoring Ms. Doe.

111. Most times she showed up at his door, he waved her away saying he was busy.

112. He would arrange meetings with her, sometimes at difficult, early hours, only to blow her off when she arrived.

113. When she got time with him, he would jawbone about almost anything but work.

114. All the while, he would tell her insultingly that she was lucky to get attention and "world class training" from him.

115. In early February 2026, Ms. Doe went to Bogatch to request advice on dealing with Moss's personality. She wanted advice, for instance, on shepherding him through meetings with clients without him taking over the meeting or speaking over her.

116. Rather than help her, Bogatch reported the conversation directly to Moss, as though it were an attack on him, and Moss then confronted Ms. Doe.

117. He explained he spoke over her and took over client meetings because she was only supposed to serve as "honey to the bees," and he needed to take over the meetings to make sure she didn't "fuck up."

118. In other words, she was supposed to use her looks and charm to bring clients through the door, but at that point he would take over.

119. Trying to ensure they would not make her the team honey trap, Ms. Doe asked Bogatch later in February if she might be allowed to observe quarterly client reviews so she could learn about the team's client stable and how Bogatch and Moss addressed retention issues.

120. She told Bogatch she wanted to move beyond prospecting and begin building a foundation for the broader business role Janney had promised her.

121. To Ms. Doe's shock, Bogatch became defensive, as though he thought Ms. Doe was trying to move in on his territory.

122. He snapped back that she was not part of the succession planning because she was "too green" and lacked his 45 years of experience.

123. His reasoning was self-defeating—Ms. Doe acknowledged that she lacked Bogatch's and Moss's experience, which is why she wanted the opportunity to learn from them. And his comment about succession planning was dismaying, as Ms. Doe would not have left Morgan Stanley had Moss not promised to make her a part of the succession.

124. In early March, Ms. Doe learned that Moss and Bogatch were shutting her out of her promised share of revenues from clients.

125. The revenue from all new accounts brought in by any of them should have been split three ways.

126. But in reviewing the accounts in the Janney system, she noticed that two new clients, T.P. and C.P., a married couple, and D.L., were being allocated entirely to Moss and Bogatch.

127. This was doubly appalling to her, since Bogatch was in a state of semi-retirement and did almost no work generally.

128. Moss even joked that Bogatch did nothing but drink martinis all day.

129. On March 9, Ms. Doe attended a meeting with Moss and Greenspon about her ongoing business development efforts, which included client meetings, events, and seminars.

130. Moss needlessly raised his voice and told Ms. Doe she was "nothing" because she had not brought in revenue, even though he was at that moment stealing the allocations from clients she had brought in.

131. By early spring, Ms. Doe's position was coming into focus.

132. Moss had lied about wanting to develop her as a financial advisor.

133. He wanted the appearance of including a woman on his team, and he wanted to use Ms. Doe to bring in new business that he would then steal from her.

134. Parallel to this professional disrespect, Moss harassed Ms. Doe and importuned her for sex, making her believe that her advancement would only be secured by giving in to his sexual demands.

135. Ms. Doe nonetheless remained determined to fight for her position and prove her worth. With a family to support, she had little choice.

136. Feeling trapped, her stress level skyrocketed, often leaving her feeling sick to her stomach.

### 6. Moss offers to help Ms. Doe get pregnant and calls Serbians "cockroaches."

137. Around this time, Moss began surveilling Ms. Doe's schedule, criticizing her for occasionally having a family or personal commitment, and disparaging her for changing client meetings regardless of the reason (for instance, when it was at the client's request).

138. This led shortly to a controlling, possessive regimen of monitoring. Moss would require Ms. Doe to send him her appointments so he could write them down in his own desk calendar. His desire to control her time went far beyond what was necessary to his role, and Ms. Doe felt demeaned by the intrusion.

139. The intrusions then began to verge on intimidation.

140. Moss followed all of Ms. Doe's social media accounts, including her Instagram and LinkedIn.

141. He often left comments on her photos saying things like "I know where you are at all times."

142. On one occasion, after Ms. Doe posted a photo of herself with her children, Moss commented "Where is hubby."

143. The comment continued a pattern of Moss wishing away Ms. Doe's husband and insinuating himself into a role as her sexual partner.

144. Over a weekend in late February, Ms. Doe was invited to do a TED talk.

145. The following Monday, Moss ordered Ms. Doe to the office at 7:30 a.m. to prepare for a client meeting at 9:00.

146. Having to take her kids to school after the weekend of the TED talk was already grueling. But when she arrived and began to review their plan for the meeting, Moss brushed her aside: "there is nothing to go over."

147. Instead, as he often did, he launched into an endless, gossipy discussion of their personal lives.

148. When she mentioned that she had just given a TED talk, Moss replied by asking "were men drooling over you?"

149. As with his comment about her eye surgery that past November, he seemed titillated by the prospect of other men being attracted to her.

150. It did not even cross his mind to offer her congratulations. He did not take her seriously enough.

151. On March 17, Ms. Doe told Moss about a prospective client who would visit the office on March 20.

152. Without even a pretense of discussing the business prospect, Moss asked if the client was "cute," told Ms. Doe that she should be prospecting attractive clients for him, and suggested she should use an appearance rating scale when discussing clients with him.

153. Moss asked similar questions about clients on multiple occasions and frequently told Ms. Doe to bring him only young and attractive ones.

154. By the end of March, Ms. Doe reached a breaking point with Moss's behavior. His harassment and lack of professionalism were making it impossible to do her job. Meanwhile, he and Bogatch were stealing the money she had earned.

155. On March 23, 2026, she and Moss called an external CPA to network.

156. When Ms. Doe learned that the CPA was Serbian, she mentioned that she noticed that there seemed to be a large Serbian community at E.Y.

157. In the full hearing of the CPA, Moss said "they are like cockroaches everywhere."

158. Later in the conversation, which Moss as ever consistently steered away from business and towards gossip, Ms. Doe mentioned that she and her husband had sons but wanted a daughter.

159. Moss understood from prior conversations that Ms. Doe had been trying to get pregnant.

160. Moss responded by saying that he had a daughter, that he knew the trick for making them, and that he could help get her pregnant with a daughter.

161. Though fearing his response, Ms. Doe responded directly that he should not have said that, and that he needed to stop.

### 7. Ms. Doe speaks out against Moss's harassment; Moss calls her a "liability" but continues to offer his services impregnating her.

162. Offering to impregnate Ms. Doe just once would have been stunning—more than sufficient to cement Moss's self-assessed status as sexual harassment's "poster child." But this soon became Moss's favorite joke to use in his endless, freewheeling rambles. It took different forms as he workshopped it across sessions.

163. Once, he talked up his "expertise," telling Ms. Doe that he knew how to position her body during sex to ensure that a daughter would result.

164. On another, he reassured Ms. Doe he knew how to make the whole experience "romantic."

165. Sometimes, he would pivot to telling her that getting pregnant would be bad for business. Moss made jokes like this to Ms. Doe about helping her make a daughter at least 20 times.

166. Ms. Doe repeatedly protested this behavior and told Moss to stop.

167. In response, Moss said Ms. Doe was a "liability."

168. On April 10, 2026, Moss insisted that Ms. Doe meet with him in person.

169. Once again, he led a rambling conversation about personal lives, with no business purpose.

170. But Ms. Doe had a number of concerns she wished to discuss with Moss.

171. Finally, telling Moss that she had another meeting scheduled, she managed to turn his focus to those concerns. She mentioned that Bogatch was not participating in the business, even though he was receiving revenue that she brought in.

172. He ignored this concern and insisted that his loyalty to Bogatch as his longtime partner dictated that he would continue getting a share no matter how little work he did.

173. Moss then began talking about his recent diagnosis with prostate cancer.

174. While tragic for Moss, in the context of the conversation he viewed it as another opportunity to harass Ms. Doe.

175. He told her the surgery carries a risk of sexual and erectile dysfunction.

176. He told her, "if you want a girl, we better do it before I have my surgery."

177. Shortly after, the two met before calling a Janney vendor.

178. Again, instead of aligning on what they would discuss, Moss harassed Ms. Doe. He spoke once more about his prostate diagnosis, and several times alluded to having a third child—meaning, with Ms. Doe.

179. Though afraid of the consequences—rightly so, as it would turn out—Ms. Doe again told Moss that nothing like that would ever happen, that she was happily married with a family, and that he needed to stop making the jokes about impregnating her. As always, Moss deflected.

180. Meanwhile, and as he continued to comment on photos of her with her family, he told her in person that he wanted to "see her in a bikini" and invited her and her kids to the pool with him come summer.

181. Moss also delighted in jokes about Ms. Doe's Orthodox Christian faith. He would tell her that because she was previously married to a Jewish man, she should wear a Star of David instead of her cross and told her to be careful not to "get struck by lightning" if she continued wearing the cross.

182. On three separate occasions in the spring of 2026, Moss would call Ms. Doe into his office on a pretext and then show her fully nude photos of women, accompanied with comments like

"she won't leave me alone!" indicating that he was cheating (or trying to) on his wife and receiving nude photos from other women.

183. On each occasion, Ms. Doe would leave the room as quickly as possible, without engaging.

## 8. Ms. Doe defends herself, and Moss and Janney retaliate.

184. As summer approached, Ms. Doe reached a crossroads. Trying to ignore the harassment and insulting conduct, to adapt and move on, was not working.

185. Moss continued harassing her, including by repeatedly offering to get her pregnant; Bogatch continued ignoring her and siphoning off her revenue; and Bedassie continued to sabotage her. Around this time, Ms. Doe told Lynn Erskine, a Janney Regional Manager, that Moss made inappropriate comments towards her.

186. In a call with Erskine on June 1, 2026, Ms. Doe again reported that Moss was acting and speaking inappropriately towards her, and that he and Bogatch were cutting her out of the business and taking her share of revenue despite Moss's promises.

187. Erskine could not have cared less.

188. She told Ms. Doe, in sum and substance, that she should be grateful for the terms under which Janney and Moss had brought her aboard.

189. The call ended without any advice, let alone a material offer to help.

190. She arranged a "teaming" meeting so that Ms. Doe, Moss, and Bogatch could better "bond."

191. Throughout the spring, Bedassie tortured Ms. Doe and made it impossible for her to do her job.

192. On June 12, Ms. Doe asked Bedassie to send paperwork to another prospective client family, S.H. and K.H.

193. Janney stood to make significant money off of this prospect; K.H.'s brother had just sold over $700 million in land, and S.H. and K.H. appeared to have ample assets to invest.

194. This time, Bedassie did not just bide her time, she outright refused to do the work.

195. She absurdly demanded that Ms. Doe apologize to her for a recent incident in which Bedassie had emptied a can of Lysol spray in the office and Ms. Doe had emailed the office manager about the heavy, lingering chemical smell that resulted.

196. Distraught, Ms. Doe emailed Greenspon on June 14 and reported how difficult Bedassie made Ms. Doe's client prospecting efforts.

197. The next day, she emailed both Greenspon and Moss with a similar complaint. On the afternoon of the 15th, she went to Moss's office.

198. Moss told her to just apologize.

199. He clearly viewed the conflict between Ms. Doe and Bedassie as a frivolous catfight.

200. He failed to grasp that if Ms. Doe bowed to Bedassie, and especially if Bedassie perceived that Ms. Doe had been asked to do so by Moss, it would only worsen Bedassie's disrespect and recalcitrance towards Ms. Doe and deepen Ms. Doe's client prospecting problem.

201. Ms. Doe followed up directly with Bedassie on the 16th and again on the 20th, cc'ing Greenspon and Moss.

202. S.H. and K.H. eventually followed up with Ms. Doe to get the paperwork, and Ms. Doe was finally able to cajole Bedassie into sending it.

203. But by that point S.H. and K.H. had lost interest. They transferred only a token $50,000 to Janney, instead of an account that could have amounted to hundreds of thousands or even millions.

204. On June 22, 2026, Greenspon belatedly met with Bedassie and Ms. Doe.

205. He acknowledged that Bedassie was acting towards Ms. Doe in ways she would not act towards Moss.

206. While he purportedly attempted to mediate the dispute between the two, he could not do so because he did not take it seriously. He too viewed it as a catfight where both sides were wrong and irrational, failing to see how such an approach legitimizes harassment.

207. As the meeting wore on, it became clear that Greenspon had only one goal: to keep Ms. Doe from reporting upwards. He asked, "how do we get past this without getting other people involved?"

208. He again mentioned that there would be negative consequences if they involved "third parties."

209. Astonishingly, when Ms. Doe complained at this meeting that Bedassie had called her a "bitch," Bedassie denied it but then immediately added (to Ms. Doe) "you're acting like one."

210. It is hard to see how anyone could view Ms. Doe as wrong, even partially, under these circumstances.

211. While Greenspon very mildly admonished Bedassie and told her to do her job, he continued to prioritize keeping the dispute out of the hands of HR, telling Ms. Doe that any attempt to go to HR on her own would compromise her chance of becoming Moss's successor.

212. But Ms. Doe repeatedly and clearly insisted that he properly report her complaint.

213. Ms. Doe had a follow up call with Moss and Greenspon on June 29.

214. Here, they told her that they had no "independent evidence" about Bedassie's behavior, even though Greenspon had personally heard Bedassie refer to Ms. Doe as a bitch.

215. Greenspon then warned her that if she filed an HR complaint against Bedassie, it would ruin Ms. Doe's chances of ever taking over Moss's business.

216. The response shows how Janney generally adopted Moss's strategy of weaponizing his promises.

217. As a purported solution to the problem, Moss and Greenspon offered to move Ms. Doe to Janney's Garden City office. But this would do nothing to ensure that Ms. Doe was respected and free of harassment at Janney.

### 9. Moss and Greenspon try to push Ms. Doe out of Janney.

218. After these complaints, Moss and Greenspon tanked Ms. Doe's career.

219. On July 1, 2026, Ms. Doe sent an email to Greenspon to document the business she had lost owing to Bedassie's malfeasance. Moss immediately shot back the following email:

> [Jane Doe], I specifically asked you not to send these emails to management and to address these issues with me. There is no reason to continuously do this and yet you are not listening to my reasons to try and take care of these issues amongst ourselves. I am not happy that you did this after I had asked you not to.

220. Ms. Doe explained in a responsive email that Moss was not understanding the scope of Bedassie's obstruction nor appreciating how it was ruining her chances at succeeding.

221. Trying to get past Moss's obstruction of her client meetings, Ms. Doe scheduled a client meeting without Moss for early July. Moss responded with an inappropriate meltdown via text, telling Ms. Doe he had lost trust in her.

222. Ms. Doe gave him her legitimate reason for excluding him:

> What concerns me is that there have been many occasions where your own comments and actions have made me very uncomfortable. For example, you've told clients and prospects that you're the "poster child for sexual harassment," and you've also told several of them that I have clients who don't want to come over. I found these comments highly unprofessional, and I don't understand why you would say those things. They put me in an uncomfortable position and reflect poorly on both of us and Janney.

223. Rather than take this as legitimate feedback, Moss pretended that the messages reflected her intention to leave, saying "I would like to get your answer as to our future so please give me a call. I dont [sic] like uncertainty and am either all in together or not." Ms. Doe did not respond.

224. The next day, Moss added "Please call me, i [sic] need to know if you are in or out. . . Either we put everything behind and work to build it together or just tell me if you want to go in a different direction [Jane Doe]." In other words, Moss would not be taking feedback, and as far as he was concerned Ms. Doe could leave Janney if she did not want to tolerate his sexual harassment and interference with her career.

225. When Ms. Doe refused to bend, Moss swiftly executed the threats that had always underpinned his harassment.

226. He told Ms. Doe that she could take the full allocation from clients she brought in—which she deserved in any case, since Moss and Bogatch not only did not contribute to her prospecting efforts but actively sabotaged her.

227. At the same time, he made clear that this meant she was completely off his team, cut off from further mentoring, and outside of the succession plans.

228. He also instructed marketing to remove her name from the Janney website.

229. When marketing moved too slowly for Moss's tastes, he called Greenspon to speed up the process.

230. He, in turn, called Ms. Doe.

231. The two discussed the entire situation.

232. Ms. Doe complained clearly and directly that Moss had sexually harassed her and disparaged her religion.

233. Greenspon credited none of this—he skeptically asked for the "context" of the religion remarks—and instead inquired whether Ms. Doe was in touch with someone at Morgan Stanley who might be able to hire her back.

234. When Ms. Doe responded with outrage at the question, Greenspon said he was just "thinking out loud for solutions."

235. Ms. Doe's experience of harassment has been life altering.

236. She has not only been degraded by Moss's behavior and Janney's response, she has been cut off from many millions of dollars in future earnings.

## CAUSES OF ACTION

### CAUSE OF ACTION 1
**Discrimination and Retaliation in Violation of 42 U.S.C. § 1981**
*(All Defendants)*

237. Ms. Doe repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

238. By the actions described above, Defendants discriminated against Ms. Doe because of her Serbian ethnicity and heritage, by, *inter alia*, subjecting Ms. Doe to disparate treatment including creating a hostile work environment.

239. As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of § 1981, Ms. Doe has suffered and continues to suffer, economic damages for which she is entitled to an award of damages.

240. As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of § 1981, Ms. Doe has suffered, and continues to suffer, severe mental and emotional distress for which she is entitled to an award of damages, along with attorneys' fees and expenses.

241. Defendants' discriminatory treatment constitutes bad faith, malicious, willful, and wanton violations of § 1981 for which Ms. Doe is entitled to an award of punitive damages.

## CAUSE OF ACTION 2

### Discrimination and Retaliation in Violation of the NYSHRL

*(All Defendants)*

242. Ms. Doe repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

243. By the actions described above, Defendants discriminated against Ms. Doe based on her characteristics in violation of the NYSHRL, including her gender, familial status, and pregnancy.

244. By the actions described above, Defendants retaliated against Ms. Doe based on her protected activities in violation of the NYSHRL, including by attempting to push Ms. Doe out of her job.

245. As a direct and proximate result of Defendants' unlawful conduct in violation of the NYSHRL, Ms. Doe suffered and continues suffering harm for which she is entitled to an award of economic and other compensatory damages, to the greatest extent permitted under law, along with attorneys' fees and expenses.

246. Defendants' unlawful conduct constitutes bad faith, malicious, willful, and wanton violations of the NYSHRL for which Ms. Doe is entitled to an award of punitive damages.

## CAUSE OF ACTION 3
### Discrimination and Retaliation in Violation of the NYCHRL
*(All Defendants)*

247. Ms. Doe repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

248. By the actions described above, Defendants discriminated against Ms. Doe based on her characteristics in violation of the NYCHRL, including her gender, caregiver status, disability association, reproductive choices, and pregnancy.

249. By the actions described above, Defendants retaliated against Ms. Doe based on her protected activities in violation of the NYCHRL, including by attempting to push Ms. Doe out of her job.

250. As a direct and proximate result of Defendants' unlawful conduct in violation of the NYCHRL, Ms. Doe suffered and continues suffering harm for which she is entitled to an award of economic and compensatory damages, to the greatest extent permitted under law, along with attorneys' fees and expenses.

251. Defendants' unlawful conduct constitutes bad faith, malicious, willful, and wanton violations of the NYCHRL for which Ms. Doe is entitled to an award of punitive damages.

## CAUSE OF ACTION 4
### Breach of the Covenant of Good Faith and Fair Dealing
### *(Against Janney and Craig Moss)*

252. Ms. Doe and Defendants entered into an employment agreement.

253. Among other provisions, the employment agreement provided that Janney would engage in good faith to bring about a fair and equitable division of revenues between Ms. Doe, Bogatch, and Moss.

254. Moss repeatedly pushed off this reckoning and division of revenues in his attempt to get Ms. Doe to have sex with him.

255. This represented an arbitrary, capricious, and malicious exercise of discretion and constituted affirmative conduct intended to block Ms. Doe from reaping the fruits of their contract.

256. As a result, Ms. Doe lost significant revenues from management of client funds and continues to lose revenue.

## PRAYER FOR RELIEF

Plaintiff demands judgement against Defendants in an amount to be determined at trial for all available relief whether it be equitable, statutory, or economic.

## JURY DEMAND

Plaintiff demands a jury trial.

**SEPPINNI LAW, PLLC**

/S/JOHN CRAIN
JOHN CRAIN

SHANE SEPPINNI
MEGAN JONES

40 Broad St.
Floor 7
New York, NY
10004

+1 (929) 552-9791
john@seppinnilaw.com